Our next case is Jiang v. City of Tulsa, number 25-5097. Counsel? Thank you, your honors. If it pleases the court, I'm Mark Smith, here on behalf of the appellant Hua Jiang. Mr. Jiang has been a long-time servant of the City of Tulsa. He began his employment at the City of Tulsa in around 2010. He came to the city by way of China, where he earned a bachelor's and a master's degree in engineering. Then he made his way to the University of Missouri-Royola in about 2006. I believe his resume says he got his Ph.D. He also obtained a professional engineering license. Mr. Jiang's resume also sets forth the experience he's had with that Ph.D. He's authored 14 journal articles. He's been asked to speak and present papers at over 28 conferences. He helped author a chapter in one of the best reference books for this area of engineering, and he's also received many awards. Mr. Jiang has basically dedicated his life to safe drinking water, and the people of Tulsa should be very thankful to have a man of this great talent. So in 2021, Mr. Jiang wanted to apply to move to a position of superintendent within one of the water plants. This move for Mr. Jiang was actually a lateral move. The purpose for him in moving to this position was because in the current engineering role he was in, there was not a path for him to move up the management ranks. He either had to, so he had to go somewhere else. The superintendent position, like I said, was a lateral move, not a demotion, not necessarily a promotion, but what came with it was the managerial responsibilities that would then allow him to start moving up his career and gain that experience later. The district court referred to it as a failure to promote claim. Is that wrong? The claim that you brought? So technically he wouldn't get a pay raise, but it does come with other benefits and other responsibilities that weren't available to him in his engineering role. So in the sense of gaining new responsibilities, in particular management responsibility, that would be, I guess, technically a promotion. Mr. Jiang himself did view it as a promotion because of those additional responsibilities he would take on. So the job description for this particular superintendent role, I think it's important to note that it had just been reviewed by the management team in April of 2021, and they did make some changes to it. It's not that they just reviewed it. They went through it and made some changes in anticipation of posting it to take applications for the open job. That job description expressly required a bachelor's degree in the particular fields of environmental engineering and technology. As part of the city's procedures, the job was posted for internal applicants. Three applicants submitted their applications, obviously Mr. Jiang, Mr. Hutchcraft, and Mr. Curry. It is then part of city policy that those candidates have to go through a process called certification, and that's basically where the HR department makes sure they check all the boxes in the job description requirement. Those three candidates were certified by HR. They were administered tests that were not scored, that were meant to test their technical aptitude. They then engaged in a round of interviews with three panelists. The three panelists included on the panel was actually the decision maker, Ms. Hunter, who would be making the ultimate decision. The panel was given a list of questions where they could write scores and sort of rank the three candidates. The scoring was not outcome determinative, as we've said in these depositions. It's not whoever gets the highest score automatically gets the job, and there was no process for, well, do we add them all up? Do we take your average score? Do we throw out the lowest score? It was all there just for Ms. Hunter's ultimate consideration. At the end of that first round of interviews, Ms. Hunter obviously selected Mr. Hutchcraft, who she believed to be the top candidate. She described him as even across the board. Mr. Jang filed a grievance with the HR department, citing both failure to follow policy and certifying these candidates and claiming race discrimination. HR denied that. He was then had exercised his right to appeal that to the Civil Service Commission. The Civil Service Commission did agree with Mr. Jang that the city should not have certified those two other candidates, leaving Mr. Jang as the only certifiable candidate that applied. In response to that, HR department went and changed the job description. There's a valid reason to do that though, right? Which is, otherwise we only have one applicant. Well, the other, the policy, the city policy allows them to open the application process to outside applicants. They never looked at that route. So there were other tools besides, we have to just change this job description. What does outside applicants mean? Well, people who aren't currently employed with the City of Tulsa. So this one was within the City of Tulsa? All three of these candidates were. It was only advertised internally, both rounds. And that's something that was available to them under that policy, was to open it to outside applicants, which, you know, who knows how many applicants they would have gotten. And so no, I don't think it was the only way to get more than just Mr. Jang to be an applicant, was to change the job description. They could have looked elsewhere and they could have put some effort into recruiting as well. Did the amended job description lower the requirements? It lowered the educational requirements, yes, your honor. It went from requiring the bachelor's degree in those specific fields of engineering and environmental sciences to requiring basically 60 hours. Well, it seems that the city is arguing that it didn't lower the requirements, but just altered the requirements to comply with the Civil Service Commission's decision. How should we be thinking about that? I think that's a twist on what the Civil Service Commission found. The Civil Service Commission found that these guys could not be certified at all because they didn't have the degree requirements. It's important to note in the policy, and the city argues that they amended that policy, but they didn't. The policy says if the job description requires specific degrees, then you cannot substitute experience for those specific degree requirements. And that's exactly what this job description had. So I've seen it in multiple places, the city laws, hey, we changed our policy to match past practice. That rule still exists in the new policy. Well, counsel, as I understand it, it isn't the city's contesting the content of the policy. I think what they're trying to say, if I understand it right, is that there was a longstanding practice, notwithstanding the policy, to substitute experience for education. Did Mr. Jang present any evidence in district court to dispute that the city was following a longtime policy in the way it substituted experience for education? Well, I think that's one of the issues with the city's... Was there any evidence that your client presented at summary judgment to create a genuine issue of material fact on whether that was longstanding practice? I think the problem is... I'm not trying to avoid it, but I have to address the affidavit to get to the bottom of your question, Your Honor. And that being, Ms. Felix-Warren's affidavit is the only evidence in the record, and it's her just bald statement that I've been doing this for 23 years and I've always violated policy. But there's nothing else that they presented besides just her bald statement of that. Well, it's an affidavit. It's unrebutted. It's not. Where's the counter evidence? Well, the counter of it is to look at what actually happened in Mr. Jang's case and look at the actual policies. Well, isn't the counter evidence that, no, this isn't the way you've done things for the last 25 years? But there isn't anything, is there? I think that's because there's an absence of any evidence that they actually did that, besides the affidavit. The evidence in this case is that they did it this one time, and in favor of two white younger candidates over Mr. Jang. No, that isn't what the affidavit's about. The affidavit said, look, we've always done it this way. And I'm not saying that's a great rationale, but it's the rationale. And the question I'm asking you is whether that's a fact, even though it's just one affidavit, but at least it's something. I mean, you know, affidavits are used to support summary judgment. And was there anything to rebut the past practice? Well, I think the CSC's determination, telling them you can't do this. I mean, it belies logic that all of a sudden the Civil Service Commission is saying, you're not following policy, but you've been following policy for 23 years. You told me nobody has ever challenged that in 23 years except Mr. Jang? I don't see anything. I've got it on screen. Where did the Civil Service Commission say anything other than this didn't follow policy? They didn't say anything about past practice. Well, that's what the city is trying to say. I know, but you're saying- I mean, the problem is the affidavit is not supported by anything. It's just a bold statement. It is? Yes, it's her just saying for 23 years I've violated this policy, but there's- Is that what- It provides nothing else to back that up. Are you quoting that? Is that a quote from the affidavit? I violated policy for 25 years? And even if it is, isn't that evidence of a common practice? Just straightly answer your question, Your Honor. I don't believe that's a quotation. I do want to pull out the affidavit.  The city's practice for at least 25 years prior to August 12, 2021, was that an employee could substitute work experience for years of education at a rate of one year of experience for one year of education, so long as the employee had half of the stated education requirement. Remind me who this is again. It's Ms. Felix Warren, who is the personnel director, the head of HR, and she has a role with the CSC process as well. Isn't that someone who would be in a position to know that that is a correct statement of fact? She would certainly know, yes, Your Honor. All right. I don't want to belabor the point, but- Well, as part of that, I mean, if that is the practice, I would challenge that, you know, what part of the practice helped Mr. Jiang at all, because everything they did made it harder for Mr. Jiang, even though originally he was the only candidate that should have been certified at all. Then you go strip away the educational requirements, and then you put him in these interview panels where, in fact, Mr. Vaughn rated him the highest candidate in those interview panels. And so when you look at the disequal treatment on the facts of this case, regardless of how long they say they've been violating this policy, then it shows that Mr. Jiang did not get a fair shake here. And it's important to note that this was- he's applied for nine different promotions and moves, trying to get himself into a different position. And I think if you look at some of the testimony from Mr. Eric Lee, where I asked him about this, you know, this engineering role and actually get himself into a management position. They had evidence of white males and a white female who had done this before in the past. Like Mr. Jiang, they were stuck in an engineering role. They were able to move laterally. And the only suggestion that came about was from Ms. Hunter saying he should actually take a demotion. And the problem with that is, obviously, working for the city can come with great benefits. One of those being that your retirement is based on how much you're earning. So for him to take that demotion, it would be a risk that maybe he never gets back up. It was the same pay, wasn't it? For this superintendent role. Ms. Hunter's suggestion was he actually go to the supervisory role, which would be an EX40, not an EX44. And that's the other thing, is that supervisory role maintains a job description that requires a specific college degree to where the superintendent, who they report to, is no longer required to have as much education. And that's part of the, where's the business justification for all these changes? And that's what I challenged all the witnesses, is why do this? Why change this job description? And most of them said the EX44 level, it is important to have a college degree because you're managing people and you need the technical know-how. And so I think... But those are two separate things, right? And that was at least the asserted answer for why he did not get this job. He had technical A-plus and management C-minus. That is Ms. Hunter's subjective opinion of his management experience. But the other evaluators did not rate him highly in the management and the supervision. And as you say, the reason that he was interested in this is so he could get some experience. In other words, he didn't have much. That is true. But I think Mr. Vaughn's deposition testimony and Mr. Lee's deposition testimony, I go into great links with how much management experience Mr. Jang has. And Mr. Lee talks in particular about Mr. Jang's leadership of the Top Ops team, which is a basically Jeopardy-style competition team. And he created the program in Tulsa and two years later, they were national champions. And how proud he was that he built that program for them. You know, he had to manage all sorts of co-workers and outside contractors as part of these multi-million dollar projects that he oversaw, capital improvement projects. And if you look at the way Mr. Lee and Mr. Vaughn talk about that experience that he has and how great that was and contrast it with Ms. Hunter's explanations of, oh, he's taking all the credit for team projects. And I'm sorry, I'm out of time. You can finish up your thought. Yeah, so if you, the juxtaposition of Mr. Lee and Mr. Vaughn's discussion of his management and leadership experience versus how Ms. Hunter just discounts everything and says he's taking credit for what were team projects, he's exaggerating. You can tell that she held specific bias against Mr. Jang. Okay, can I ask one more question? Could you clarify something for me on your retaliation claim? So what adverse actions form the basis for your retaliation claim? So the second denial of the promotion is the base adverse action, okay? And we also believe that HR rewriting this job description to allow the second round of interviews, we believe that that was a retaliatory action as well. HR got reviewed- Can I just do a follow up? Yes. Because the city contends that you didn't argue that in district court, that the second non-selection was retaliatory. I take it you disagree with that. I do disagree with that, Your Honor. I think we've presented all these issues. And again, that gets to some of our arguments about the court's myopics focus on discrete acts and discrete actions as opposed to taking a holistic view as we should on summary judgment. Thank you, counsel. Thank you, Your Honor. Hayes Martin for the City of Tulsa. May it please the court. This is a case about disappointment, not discrimination. This is not a case about whether the City of Tulsa made the correct decision in choosing a candidate other than Mr. Jiang. Instead, this is a case about whether Mr. Hua Jiang, a disappointed job applicant, has produced evidence from which a reasonable jury could infer intentional discrimination or retaliation. The district court correctly ruled that he did not. This court should affirm for three reasons. First, the district court correctly applied the Rule 56 summary judgment standard within the McDonnell-Douglas framework. There is no genuine dispute of material fact in this case and the district court did not improperly weigh credibility or evidence. Appellant's contentions are based on conjecture, speculation, and often statements not found in the record at all. When evaluating the admissible evidence that could go to a reasonable jury, no reasonable jury could find for appellant. Second, regarding the retaliation claim, the district court correctly held that Mr. Jiang did not establish a prima facie case for retaliation. Mr. Jiang certainly had protected opposition. He complained that he had been discriminated against. However, he also has to show an adverse employment action and show a causal connection between those. But didn't the district court treat Mr. Jiang's non-selection as the basis for his retaliation claim? Do you agree with that? So the, I, for the most part, yes. The issue would be that Mr. Jiang did not craft a clear retaliation claim. Cited to tens of pages of deposition testimony in a three-page document entitled Retaliation and Intimidation Records and simply stated, retaliation happened. Did not clearly articulate that he was claiming the second change was, that the second non-selection was a retaliatory act until appeal. However, even so, cannot show causation. The city of Tulsa had the same justification, the same operational needs during the first election that it had during the second. There is no way that Mr. Jiang can demonstrate some retaliatory animus that somehow manifested. So the city of Tulsa was consistent in its justification, in its process, in its decision. I'm a little confused. So are you saying that the October 2021 non-selection should be viewed as an adverse action, except the city still prevails on the causation element? Had Mr. Jiang raised it at the district court. Okay, so you maintain your position that it wasn't properly advanced in the district court. Yes, a non-selection could be. And so my question is, it seems that the district court did pass on it or at least understood it that way. And my question to you is how we should be thinking about that. I think that's the district court viewing it in the light most favorable to appellant's claims is that the change in job description is not an adverse employment action. None of the other things that he lists is an adverse employment action. The only thing that possibly could be would be the second non-selection, but there's no causal connection and similarly would still fail on pretext. And then regarding pretext, there is no evidence of pretext sufficient to discredit the city's legitimate non-discriminatory justifications for its actions. Let me ask you a question about the pretext. So the Civil Service Commission said that under city policy, Mr. Curry and Mr. Hutchcraft should not have been considered for the promotion in the first instance. Yes, there were two civil service appeals and the first civil service appeal after the first non-selection, first certification process, the Civil Service Commission stated that they determined that the city did not follow the policy in the city's position as the Civil Service Commission understood it. Okay, that's the first half of my question. So then HR changed the job description so that they could be considered. HR changed the job description to match what the past practice had been. Well, it just so happened that Mr. Curry and Mr. Hutchcraft are back on the list. Well, so the city had applied this policy and procedure in that manner as Ms. Felix Warren stated, but also as other witnesses testified. Ms. Hunter stated this is how she understood the process. There actually is an instance of another superintendent that does not have one of those qualifying degrees. Furthermore, Mr. Hutchcraft was certified for his pre, sure. I'm still trying to get to my pretext question. Yes, sorry. And it just seems like what happened here is that in this process, there was at every step of the way, it seemed like they were trying to put Mr. Hutchcraft in a position to get selected. And when it didn't work the first time because of the degree requirements, Civil Service Commission comes back and says, that just violates our policy. HR turns around and says, oh, we're going to rewrite the job description. It just seems like there's some manipulation of the process there to get to the same result. Why isn't that pertinent to pretext? Why doesn't that raise some questions about the way Mr. Jang was being treated? What we're looking at for pretext is whether or not we have a disturbing procedural irregularity that uniquely disadvantages, and uniquely and directly disadvantages Mr. Jang based on a protected trait. Here, as I cited, there's an unpublished or 10th Circuit opinion, Hamilton versus Oklahoma City University, that dealt with a similar process where the selected candidate did not meet the job requirements for the job. They required a PhD. They selected someone that had not completed their dissertation. They did not have a PhD. The court, 10th Circuit in that case, stated that that alone, while it might have disadvantaged him based on his educational status, it was in no way related to a protected trait. We're looking at a similar thing here. Any change does not affect Mr. Jang based on a protected trait, whether it's his age, national origin, or his race. He can only allege that he's disadvantaged because he wanted it to be a degree contest, and that's not what happened. And the change by the city is a compliance measure, that the city had been managing its HR in a certain way for years. This appeal has, we have a disinterested commission based under our charter that makes this determination, the Civil Service Commission. And the city says, no, that's the way we liked doing things. That's how we've done it. That's how we want to keep doing it. We're going to make these changes to continue doing it. And that's what they did. There's nothing that says that as soon as Mr. Jang makes a complaint that it freezes the process in time, and the city can't change a job description. There are 10th Circuit cases that show you can change a job description to lower the requirements. That's not a disturbing procedural irregularity on its own. And similarly, the 10th Circuit has held that certification of candidates that don't meet the educational requirements isn't enough on its own. There's no link here that can show that change in any way is connected to a protected trait. And that is where this is fatal for Mr. Jang on procedural irregularity. Let me just press it a little bit more. Sure. If they hadn't changed the job description, at that point, wouldn't he be the only candidate? If they didn't change the job description and didn't change any policies, he might be the only candidate, and that does not mandate that he would be selected. Now, I understand that, and I understand your argument, your reading of the evidence, but would it be reasonable for a jury to say what's really going on here is that they were going to do everything they could not to select Mr. Jang. That's what's going on, and that's pretext. I think the issue here is that Mr. Jang never was going to fit the operational needs with his education. His education doesn't get him there. You know, Judge Phillips was correct. It's absolutely an A-plus in education, the highest education of anyone that applied, a huge amount of academic knowledge, but very limited actual operational experience or management experience. All of Mr. Jang's arguments about qualifications deal solely with his strength. He never contends with his weakness, and he never contends with the other applicants' strengths. You know, this was a situation where there were three applicants, all strong in different areas. Mr. Hutchcraft was the, I struggle with it. It's almost like a Goldilocks. You know, one has, or Mr. Curry has a ton of management experience, but doesn't have the technical experience you need. Mr. Jang has a ton of academic knowledge. No one can test that, and the city values that in his position as an engineer. But he didn't have the operational or management experience he needed. Mr. Hutchcraft, those met in the middle where he had that operational knowledge as an operations supervisor, and then had that management experience from that position and from his time in the military. Let me shift gears for just a second. I want to make sure I'm understanding your position on the retaliation claim. I know you've already talked about it a little bit, but is it, do you agree that Mr. Jang's non-selection the second time, however it was argued, but the non-selection the second time, that would be an adverse employment action? Yes, the non-selection would be an adverse employment action. Yes. Regarding the other claims, Mr. Jang also argues that the process was wholly subjective. I think Mr. Jang falls into a fairly common trap of relying very heavily on Garrett versus Hewlett-Packard. This case is entirely an opposite to Garrett, where what we're looking at is a very transparent process, more like Heinz versus Sprint Management or Conroy versus Vilsack, where everyone can see what the thought process was, how everyone was scored. It's entirely transparent. And you're necessarily going to have subjective determinations in any process as this court is held. I'd also like to address, regarding business justification, first, not raised in the district court, there was no contention by, regarding the second prong. Mr. Jang made no argument at the district court regarding the city's legitimate business justification. On appeal, argues that the district court crafted one for the city. I look at it as it's worded slightly differently than the way the city words it. Either way, still supported by the record. What's disturbing to me is that most of the evidence related to other managers stating that they don't see the business justification. One, I don't really see that strongly in the record. And where it does show up, it's other managers in different chains of command that are not responsible for this position. Particularly, Eric Lee was not a manager at the time, was not involved in that decision. So any exclusion of him makes sense. Why would he be excluded in that decision? Ms. Hunter stated in her deposition that she didn't recall if she was consulted, but was sure she was. Appellant states, both at the district court and here, that she said she wasn't consulted, which is not supported by the record. And the record also includes the job description request for action. It includes the email that loops in Stephanie Hunter on that decision. And also, very glaringly with Joe Brown, appellant states that she said that she felt HR had discriminated against Mr. Jung. I addressed this at the district court. I addressed it in response here. At no point has that been retracted by appellant. Didn't address it in his reply when Ms. Brown very specifically said, no, I don't feel he was discriminated against by HR. She certainly didn't like the process. But her liking that process is far afield from stating that she thought it was discriminatory. And she very much so stated she did not. All of this is to say that the entire basis for appellant's claims are it's speculation from people that don't have personal knowledge, it's conjecture from himself, or it's not supported by the record. The district court correctly viewed the record evidence. There are things that appellant claims were disregarded because they aren't supported by the record. And the district court- Can I ask you a question about how the district court viewed the record according to what our law requires for pretext? Yes. It seems to me that the district court may have been thinking about pretext plus, which is not the law, right? And Mr. Court said in discussing Mr. Jung's the city's amendment to the job description, said plaintiff has not identified any comments by coworkers or other incidents suggesting he was subjected to mistreatment because of his race and age. But he didn't have to do that, did he? To satisfy the standard. It seems that if the court is evaluating the record evidence under a pretext plus standard that isn't the law, wouldn't that be reversible error? So I would disagree that that's what the court was doing there. What the court was doing is looking at first, is there any direct evidence of discrimination? If there is, we don't apply McDonnell-Douglas. So the court, when stating plaintiff has not identified any of these things, is stating that plaintiff has not identified direct discrimination, so we have to move to McDonnell-Douglas. That's what this circuit holds. That's what the court did. So I don't think there's any rational argument that that's really what happened here. Do you think the best reading of what I just read to you is this goes to the absence of direct evidence of discrimination? See, I've run out of time. Can I go ahead and answer? Please. Yes. That is exactly how I read it. Is that is the start of the section on, I believe, pretext, but it's during the McDonnell-Douglas discussion. That's the court identifying how we get to this analysis anyways. Thank you. Thank you, counsel. OK, I think you both went over a little bit, so we'll take the case as submitted, and counsel are excused. I'd like to thank both of you for your arguments.